**STATE of Missouri, Respondent,**

v.

**Ralph WEATHERWAX, Appellant.**

**No. WD 32358.**

Missouri Court of Appeals,
Western District.

April 13, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied June 1, 1982.

H. William McIntosh, Meise, Cope, Coen & Jester, Kansas City, for appellant.

James A. Broshot, Pros. Atty., Kingston, for respondent.

Before PRITCHARD, P. J., and TURNAGE and CLARK, JJ.

TURNAGE, Judge.

Ralph Weatherwax was found guilty by the court of speeding and assessed a fine of $35. He appealed to the Supreme Court, but that court transferred the appeal here on the grounds that the constitutional issues attempted to be raised had not been presented at the first opportunity. *State v. Weatherwax*, 607 S.W.2d 692 (Mo.1980).[1]

On this appeal the decisive issue is the failure of the patrolman to test the radar set at the site of the arrest and reasonably close to the time of the arrest. Reversed.

On December 4, 1978, Trooper Elliott of the Highway Patrol left his home at 7:00 A.M. to go on duty. While parked in his driveway, he tested his radar unit with two

---

1. Weatherwax has filed a motion to transfer this case prior to opinion to the Supreme Court because a constitutional issue is involved.

That contention has already been decided adversely to Weatherwax. The motion to transfer prior to opinion is overruled.

tuning forks and found it to be operating properly. Shortly before 11:00 A.M., the trooper was parked beside Highway 36 when he observed an automobile driven by Weatherwax and trained his radar unit on that automobile. His radar unit indicated a reading of 69 mph in a 55 mph zone. The trooper stated he had not tested the unit since 7:00 A.M. and did not test it at the site of the arrest. He did test the unit about 4:00 P.M. on that same day when he went off duty and found it to be operating properly.

James Smith, an employee of the Highway Patrol assigned to radar repair and certification, testified. Smith testified to the tests performed on radar units to insure their accuracy. Smith testified that outside influences such as power lines and neon lights can affect the readings obtained on the radar set used in this case. Smith also testified that the operation of a heater fan in the trooper's automobile or the operation of two-way radio equipment could also affect the operation of the radar unit.

In *City of St. Louis v. Boecker*, 370 S.W.2d 731, 736[4] (Mo.App.1963) the court reversed a conviction because the city failed to show that the radar unit had been tested at the site and reasonably close to the time of the arrest. The court stated that there could not be the slightest doubt as to the requirement for the test at the site of the arrest and reasonably close in time to that event. The basis of the court's ruling was the fact that outside factors can affect the operation of the radar unit as well as the fact that the unit can be affected by movement from place to place. At page 737[5] the court stated:

> "But the requirement that proof be adduced that a radar speedmeter was tested and found to be operating properly at the site of and reasonably close to the time of an arrest should not place an undue burden on the prosecution, and should at the same time protect the rights of motorists against the possibility of error in this device which makes 'delicate measurements.' State v. Graham, supra."

The State, in its brief, concedes that *Boecker* requires testing of the radar unit at the site of the arrest and reasonably close to that time, but urges this court to overrule *Boecker*. This court has no inclination to announce a rule contrary to that in *Boecker*. This for the very simple reason that the scientific evidence presented in *Boecker*, and also in this case, shows that outside factors, such as power lines, can affect the operation of a radar unit. If the rule in *Boecker* were to be abrogated, then a radar unit could be set up in any location whether or not there were outside factors which would give an incorrect reading, and the prosecution would have no burden to show that the radar unit was operating properly at the site of the arrest. As stated in *Boecker, State v. Graham*, 322 S.W.2d 188 (Mo.App.1959) held that a radar unit is an extremely sensitive machine. As shown by the testimony in *Boecker*, and in this case, these units are sensitive to outside forces and must, therefore, be checked for accuracy at the site of the arrest. Further, as with any mechanical device, Smith testified in this case that radar units do malfunction. As stated in *Boecker, supra*, it is not an undue burden to place on the prosecution to adduce proof that the radar unit was operating properly at the site of the arrest and reasonably close in time to it.

Apparently, in an effort to overcome the failure to test the unit at the site of the arrest and reasonably close in time to that event, the State asked the trooper: "Based on your experience as a patrolman, as a driver, and your use of the radar device, did you also form an opinion as to the speed of this vehicle?" The trooper replied that by use of a combination of all three of those factors, he determined that the vehicle was traveling 69 mph. Because the radar evidence was inadmissible for failure to show that the unit was tested at the site of and reasonably close in time to the arrest, this opinion would likewise be inadmissible because the radar evidence was inextricably mingled with the other factors used by the trooper to determine speed.

It follows that the State failed to make a prima facie case when it failed to prove

that the radar unit was tested at the site of and reasonably close in time to the arrest.

The judgment is reversed and the defendant Weatherwax is ordered discharged.

CLARK, J. concurs.

PRITCHARD, P. J., dissents in separate dissenting opinion.

PRITCHARD, Presiding Judge, dissenting.

Appellant was convicted of driving 69 miles per hour on U.S. Highway 36, a 55 mile per hour speed limit area. He was fined $35.00 and costs.

The appeal was first lodged in the Supreme Court. That court held in *State v. Weatherwax*, 607 S.W.2d 692, 693 (Mo. 1980), that there was no proper raising of a constitutional question for the first time on a de novo appeal from a first trial wherein appellant was found guilty and fined $25.00. Appellant has filed a motion in this court to retransfer his case to the Supreme Court, but that motion must be, and is, overruled because that court has already held that no timely presentation of any constitutional questions was made. The remaining issues, which are decided, relate to the admission of evidence of the result of the use of a speedgun light radar device for the contended reason that no proper foundation therefor had been laid. It is said that without that evidence, there would have been insufficient evidence for a conviction.

After this case was submitted in May, 1981, because certain findings of the trial court referenced testimony of witnesses as to a foundation for the admission of the radar test results, and because that testimony was omitted from the abbreviated transcript of tape recordings, a further transcript was requested. Delay was occasioned in the further transcription of the trial tape, but it has now been received.

According to Trooper John W. Elliott, the device which he used to measure appellant's speed on December 4, 1978, at about 11:00 a. m., was a C M I Speedgun 8, with serial number 3200 30 34. He tested that device [at his residence in Hamilton, Missouri, which this court may judicially know is about 5 miles east of the intersections of U. S. Highway 36, and Highways D and J, where appellant's arrest was made. *Walsh v. Table Rock Asphalt Const. Co.*, 522 S.W.2d 116, 118, footnote 1 (Mo.App.1975)] for accuracy when he went on duty that day a few minutes after 7:00 a. m., using two tuning forks, one for 30 miles per hour, and one for 70 miles per hour, on the moving mode (holding the tuning forks in front of the radar unit), the stationary mode, and on the patrol display. He also made a calibration check. These procedures were approved by the Patrol. The tests Elliott made showed that the unit was accurate for both speeds. He had been familiarized with the unit by a field officer, had practiced with it, and it was also his responsibility to read the operations manual for each radar unit used. He had been using the Speedgun 8 for about 18 months, and other radar units for about four years. Elliott set up the radar unit with his patrol car in a stationary position, facing east, where there was a slope or uphill grade going west. The unit was placed on the driver's door, window rolled down, and its antenna was held outside the vehicle. There were no power lines in the exact location. He made the same tests on the unit when he went off duty (the place where these tests were made does not appear in the record), the results being the same as that morning. The 30 mile per hour tuning fork had a serial number C 14581, and the 70 mile per hour fork had a serial number C 14553. Appellant's speed was measured by the unit at 69 miles per hour in a 55 mile an hour speed limit zone on the highway. Elliott also gave an opinion, based upon his experience as a patrolman, a driver, and his use of the radar device, that the appellant's speed was 69 miles per hour.

James W. Smith had been employed 9½ years by the communications division of the Missouri Highway Patrol, assigned exclusively to radar repair and certification. He tested and certified the accuracy of radar units used by the Patrol. His extensive

qualifications and experience in electronics and the radar field were unquestioned.

Smith testified in detail as to the procedures used by him to test radar units and tuning forks in the repair shop in Jefferson City. Radar units are by Patrol policy checked annually, but on the average, they will come in on a quarterly basis. Test equipment includes a microphone, audio amplifier, frequency counting device for vibrations or pitch of the tone, and a short wave receiver for radio station WWV, run by the U. S. Bureau of Standards, located at Fort Collins, Colorado, which insures the accuracy, by cancelling out pitch or tone, of the frequency counter, which, in turn, will test the accuracy of tuning forks. Radar units are tested by master tuning forks, which are calibrated the same as (field) tuning forks. After he has run tests on radar units and tuning forks, he issues certificates of accuracy on them. The radar unit and tuning forks used by Trooper Elliott were tested by Smith on November 29, 1978, and December 26, 1978, and were found to be accurate. His certificates of accuracy were received in evidence, and serial numbers thereon correspond to those testified to by Elliott.

The majority opinion rests upon a rigid application of *City of St. Louis v. Boecker,* 370 S.W.2d 731 (Mo.App.1963) [in which this writer participated as special judge]. The real basis for that case is that the radar unit was not tested at the (stationary) site of the arrest, and there was no evidence of when or where a single prior tuning fork test was made, thus the conviction based upon a radar speed test on June 1, 1961 (almost 21 years ago) was properly reversed. The *Boecker* case had in it references to the conclusions and recommendations of a Doctor Kopper's *1955* law review article on "The Scientific Reliability of Radar Speedmeters", 33 N.C.L.R. 352, which may have been accurate at that time. That reference, however, was not necessary to the decision which rested upon the lack of proof that the radar unit was working properly at the scene of the arrest, and it is therefore dicta. It is not necessary to "overrule" the *Boecker* case, nor to write in conflict with it, because it is distinguishable upon its facts from this case.

Here, there is evidence that the radar unit and tuning forks were tested in the Jefferson City laboratory on November 29, 1978, five days before appellant's arrest, and at the same laboratory on December 22, 1978, twenty-two days after the arrest. Both laboratory tests showed the unit and tuning forks were working properly. Elliott tested it some five hours prior to the arrest, and the unit properly registered 30 and 70 miles per hour by the use of the tuning forks, albeit that it was some five miles from the scene of the arrest. And, importantly, the radar unit was tested again by Elliott upon his leaving his tour of duty that day, with the same results of speed registry as of that morning. The existence of these same facts at different times and places, showing that at *all* times the radar unit and tuning forks were working properly, gives rise to a legitimate inference that they were working properly at the time of appellant's arrest. The rule is stated in 32 C.J.S. Evidence, § 585, p. 714, "Since there is a presumption, as discussed supra §§ 124(1)–124(5), of the continued existence of a fact or condition of a continuous nature, it follows that such a fact may, within the limits of relevancy, be shown to have existed at a particular time by proof of its existence at a prior time; and its existence at a subsequent time may be shown where the interval is short as compared with the natural permanent nature of the fact or condition in question." See also the extensive discussion in II Wigmore on Evidence, § 436, p. 512, et seq.; and *City of Phoenix v. Boggs,* 1 Ariz.App. 370, 403 P.2d 305, 307[1–3] (1965), where evidence was received as to a condition of a roadway both immediately before and after an accident (to give the jury an inference as to its generally dangerous condition at the time of the accident and how it happened), the court saying, "The applicable general rule, in either setting, is well established that evidence of the existence of a particular fact before and after an act in question, * * may be shown to indicate the existence of

that same condition or happening at the time of the act or accident. (Citing Arizona cases.)" Note also the cases cited in the *Boggs* case, *Millman v. United States Mortgage & Title Co. of New Jersey*, 121 N.J.L. 28, 1 A.2d 265, 267 (1938); and *Oklahoma Natural Gas Co. v. Ross*, 131 F.2d 238, 240 (10th Cir. 1942). See Anno. 7 A.L.R.3rd 1302, "Presumption—Condition of Property", and particularly the cases in Missouri at § 4, p. 1311, noting the relaxation of the older rule that a presumption or inference does not run backward, for example, *Liebow v. Jones Store Co.*, 303 S.W.2d 660, 665 (Mo.1957).

These following cases support the application of the rule of legitimate inference above set forth: *Thomas v. Norfolk*, 207 Va. 12, 147 S.E.2d 727 (1966), which held that proof that a radar set had been tested at 2:30 p. m. and at 9:30 p. m., showing accuracy both times, *in the absence of evidence to the contrary*, warranted the inference that the machine was operating accurately during the interim, or at 4:00 p. m., the time of defendant's arrest. *State v. Carta*, 2 Conn.Cir. 68, 194 A.2d 544, 546[1–5] (1963), cert. den. 150 Conn. 724, 197 A.2d 932, held "[T]he speed recorded on a radar unit may be admissible in evidence provided the accuracy of the radar unit at the time in question is established by tests made within a reasonable time before and after the speed was recorded and provided the speed recorded was for the defendant's automobile." In *People v. Maniscalco*, 94 Misc.2d 915, 405 N.Y.S.2d 888 (1978), the court affirmed a conviction based upon radar unit speed readout where the officer made calibration tests and tuning fork tests when he set up the unit and after his tour of duty. There was also evidence that the tuning forks had been tested by calibration both before and after defendant's infraction. [Contrast *People v. Cunha*, 93 Misc.2d 467, 402 N.Y.S.2d 925, 926 (1978), where it was held that the People had not met the standard of "reasonable proof of accuracy" where the officer had tested the radar unit 3½ hours prior to clocking defendant's speed, but there was no testimony of testing *subsequent* to the incident.] *State v.*

*Trantolo*, 37 Conn.Super. 601, 430 A.2d 465 (1981), held that the test of a radar device by the use of a tuning fork both a few days before and a few days after the arrest was strongly corroborative of the officer's testimony of his speedometer reading.

There is yet another facet to this case. Although appellant's speed at the time of his arrest was recorded from the *stationary* position of the patrol car, there was testimony that the CMI Speedgun 8 radar unit was adaptable for use from a *moving* patrol car whereby the speed of an oncoming vehicle could be measured. Of what use then, in that circumstance, would an on-site, approximate-time test in accordance with the *Boecker* case be? How can radar equipment be tested "at the site" if the patrol car, and the target vehicle, are constantly moving over perhaps miles of highway? Could not a legitimate inference be drawn that the moving radar unit was working properly at any arrest scene by proof that it had been tested in a reasonable time prior to and after the arrest?

The state has made a *prima facie* case that the CMI Speedgun 8 radar unit was recording accurately at the time of appellant's arrest, as per the facts of prior and subsequent tests above set forth. That is all that it is required to do, and the burden of going forward with the evidence to show that some on-site condition, circumstance did interfere with its accuracy, was upon appellant, who produced no such evidence. Officer Smith's testimony that radar units *do* malfunction does not show that it was in fact malfunctioning at the time in question—the inference of fact is otherwise. Appellant's conviction should be affirmed, because the circle of proof of proper functioning of the radar unit is complete, and thus provides a proper foundation for the readout of his speed therefrom for it to be admitted into evidence.

For the foregoing reasons, I respectfully dissent.